Judge' Rise
delivered the opinion oí the Court.
A paper dated the 9th of April, 1839, was on the 15th of March, 1841, produced and offered in the Scott County Court for record, as the last will and testament of Jeremiah Minor, deceased, which after the examination of witnesses was rejected by that Court. This decision was, by writ of error, brought into the Scott Circuit Court for revision, and upon a re-examination of witnesses in that tribunal, the judgment of the County Court was reversed, the said paper adjudged tobe the last will and testament of Jeremiah Minor, deceased, and ordered to be recorded. From which judgment of the Scott Circuit Court, the heirs and representatives of Jeremiah Minor have appealed to this Court.
By this paper, if regarded as atalid will, the testator emancipates all his slaves, and gives to them all his land, a tract of 350 acres, as well as the greatest part of his personal property. The due execution of this paper as the will of Jeremiah Minor, in conformity with the statute of wills is not controverted.
The questions presented are, 1st, was or was not the deceased of sound mind and memory, at the time this will was made; or in other words, had he then sufficient capacity to make a rational testamentary disposition óf his estate?
2d. Was, or was not the execution of the paper procured by the undue influence of the emancipated slaves, brought to bear upon the mind of the deceased, when enfeebled by illness and extreme old age?
Facts stated, from which the Court decide that the test’rs. mind was so impaired by age & infirmity that he was not capable of mailing a will,
The affirmative of both propositions is established by a decided preponderance of the proof presented in the record.
The only persons present when the paper was acknowledged, was the wife of the deceased, and the three subscribing witnesses, to-wit: Belfield Glass, and John and Burton House. Glass wrote the will when no other persons was present, but the testator and himself.— He states that the testator was between 90 and 100 years of age, that he was of sound mind and memory for a man of his age, but scarcely competent to make a will at the time this was written; this witness also relates facts and circumstances which of themselves would tend to produce doubt as to whether the mind of the deceased was not then so enfeebled, and his judgment and memory so impaired, as to amountto incapacity to conceive, arrange, and dictate a will, making a sensible or rational disposition of his estate. Burton House, another subscribing witness, states that he was a near neighbor, nnd well acquainted with the deceased, and had many opportunities of becoming well informed as to the condition of bis mind. lie further states that when he witnessed the will, and for several months previous thereto, he thought the deceased was of unsound mind, and incapable of making a will, or of transacting any ordinary business. The witness then, after relating some facts and circumstances upon which his opinion is founded, again says he believed the mind of the testator was unsound at the time the will was made;, and so continued until his death, John House, also a subscribing witness, states that he now thinks, and thought at the time he witnessed the will, that the deceased had not mind enough to make a will, or any rational disposition of his estate, and gives a reason why lie witnessed the paper, notwithstanding his opinion of the incapacity of the testator. He further states, that for five years next preceding his death, the deceased was a perfect child, and had not sufficient capacity ta manage his own affairs or dispose of his estate. This. *108 witness relates a number of facts and circumstances which would reasonably induce the opinion formed by him. Eight other witnesses who appear to be intelligent men, and most of whom had many opportunities of being well informed as to the state and condition of the testator’s mind and body, give it as their opinion that at the date of the will in contest, his intellect and memory were so utterly enfeebled and impaired by old ago, that he was not capable of disposing of hjs estate by will, or of transacting with discretion any business. And each of the witnesses state conversations and con» d.uct of the deceased, and facts and circumstances with respect to the condition of his farm, business, and af» fairs, and in regard to the condition and conduct of his slaves which tend to show that their opinions were well founded, and which exhibit an almost entire wreck and prostration of the intellectual faculties of the deceased. In opposition to this mass of evidence, is the testimony of Wm. Riddle, who states thathe always thought that the testator was competent in mind to make a will, that he was a man of very fine mind, made his own contracts, and was unusually smart. This evidence is so flatly contradicted by, and so utterly inconsistent with the testimony of ten other witnesses, who appear, from the character of the proof made by them, to be men of considerable intelligence, as to raise a doubt of the sincerity and candour of Mr. Riddle’s statements.
The only other witness introduced in favor of the will, is David Hudson, who, without expressing any opinion as to the capacity of the testator, merely states thathe bought a sow and pigs from the old man, about three months previous to his death, that the old man asked five, and witness offered four dollars, which being a fair price, was accepted.
Upon the question of capacity or incapacity of the testator, in this case, two of the subscribing wetnesses upon their testimony, condemn the will as the production of a .mind rendered incompetent by disease and ex* *109 treme old age, the other subscribing witness and draftsman of the paper, in his evidence leaves it a doubtful question, at least as to the testator’s capacity to make a will.
Fact5? and cir* cumsiances from which the Court decide that the testator, who was between 9U and 100 years of age, and feeble in body & mind, was unduly in* iluenced by his slaves to malee a will by which they were Jo b$ emancipated,
As to the second question presented, it is in proof that after his wife’s death, the testator lived alone with his slaves, that they had unbounded influence over him, and controlled him at discretion. Various instances are given in the testimony of the witnesses, that tend not only to show lhat his slaves (who done ns they pleased without check or control,) had great influence and control over-the mind of the testator — but that this influence and control was actually exercised to procure the execution of this paper, by which his own legitimate offspring are almost entirely pretermitted, and by which the slaves take, not only their own freedom, but the entire real estate, and almost all of the personal property which belonged to the deceased.
It is proved that in 1835 & 1836, when his wife was living, that he had made and acknowledged a previous will, by which he gave his whole estate, including his slaves, to his own children. But when second childhood and complete dotage had overtaken him, this present will is produced, by which those very slaves are enfranchised, and who in exclusion of his own children, and the off-spring of,his body, take nearly the whole of his estate. It is proven that his children were obedient and affectionate when with him, which excludes the inference that his slaves were preferred to them as subjects of his bounty on account of ungrateful or improper conduct. It is proven that Glass, who wrote the will, owned a negro woman who was one of the same family of slaves belonging to the testator ; that he resided eight miles distant from the residence of the testator in a different County; that the information that the deceased wished him to come and write his will, was* communicated to him at three different times by ne-groes, first by a negro man who was the husband of his negro woman, next by a free negro man, and the *110 third time by a negro named Tom, one of the emancipated slaves.
The style and orthography of the document, (a fac $imile of which is set forth in the record,) shows most conclusively that Glass, its author, was not much better qualified to compose than the testator was to dictate a last will and testament. Why should Glass, who had neither suitable qualifications, practice, or reputation for writing wills, be the person selected, in this single instance perhaps, to write the will of this imbecile old man, instead of his friend and near neighbor, Mr. Calvert, who was a magistrate, a man of respectability and intelligence, in whose integrity and capacity the testator had full confidence, and who had been for manj? years before, in the habit, at the request of the testator, of writing for him, and preparing his papers? The answer suggests itself, that the influence of testator’s slaves may have caused his selection to perform a task to which he had never been accustomed, and for the performance of which he was so indifferently qualified.
John House states, without qualification, that the slaves had unbounded influence and ooqtrol over the testator, and relates various instances to show the eor--rectness of his opinion.
Martin Iframblett, who appears from the character of his testimony to'be a very intelligent man, states that his (testator’s) slaves, and especially old Fan, the mother of the family, could make him do as they pleased ; and gives a particular and detailed account of facts in corroboration of his opinion, and of the further opinion expressed by him, that the testator was not competent in mind to have made any important contract, or any rational disposition of his estate at the date of the paper before the Court.
Thomas B. Catlett gives evidence of like character, and after stating a number of facts too numerous to bo repeated, expresses the opinion, as based upon his personal knowledge and observation of those facts, that (luring the last five years of testator’s fife, £<he liad *111 hot mental capacity to have made any important contract, or any rational disposition of his property by will.”
Robinson Johnson for appellants; Duvall for ap-pellees.
The testimony of Thomasson, Motherhead, Smith, Calvert, Sailor, and Sebree, is concurrent with and corroborative of that of the other witnesses; and it all •tends to produce the' conviction that the paper in contest was procured to be executed by an improper influence exercised by his slaves* upon the exhausted faculties and expiring intellect of an old man, bending under the weight of near one hundred years, and who, from a sense of utter helplessness, and a feeling of complete dependence upon these slaves* was rendered incapable of resisting that influence;
With this view of the testimony in this cause* it is the opinioir of the Court that the paper in question is not the true last will and testament of Jeremiah Minor, deceased, and that it was properly rejected by the County Court of Scotts
Wherefore the judgment of the Scott Circuit Court is reversed, and the cause remanded for that Court to affirm by its judgment, the order of the Scott County Court by which the said paper was not received as the last will and testament of Jeremiah Minor, deceased, but properly rejected.